**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

**SAVILLS STUDLEY, INC.**

       Plaintiff,

v.

**ASHLEY ELKIN**

       Defendant.

---

**PLAINTIFF SAVILLS STUDLEY, INC.'S
MOTION FOR PRELIMINARY INJUNCTION**

---

NOW COMES Plaintiff Savills Studley, Inc. ("Savills Studley"), by and through undersigned counsel, as and for its Motion for Preliminary Injunction against Defendant Ashley Elkin ("Elkin") pursuant to Federal Rule of Civil Procedure 65.  In support hereof, Plaintiff respectfully states as follows:

## <u>INTRODUCTION</u>

This case involves a brazen betrayal of trust by an employee against her former employer. Savills Studley is a real estate services and brokerage firm specializing in commercial tenant representation and consulting.  In direct contravention of the express terms of a valid and enforceable employment agreement, one of Savills Studley's former brokers in its Denver office, Ashley Elkin, engaged in a premeditated scheme to steal its confidential, proprietary, and trade secret information before Elkin's abrupt, resignation from Savills Studley. *The night before her*

*resignation*, Elkin surreptitiously entered Savills Studley's Denver office premises in the middle of the night with an unknown male companion and filled numerous boxes with company documents with the intent to permanently deprive Savills Studley of such documents.  Further, in the weeks preceding her resignation, Elkin uploaded a vast amount of confidential, proprietary, and trade secret information to her personal Dropbox account while simultaneously trying to cover her tracks by taking steps to delete files stored on her company-issued desktop computer. It was only through the retention of a third-party forensic investigator that Savills Studley was able to discover the extreme scope of Elkin's nefarious plot.  And despite repeated requests made to Elkin (and her counsel) for the return of this information, Elkin has steadfastly refused to do so.

In addition to Elkin's theft of her employer's protectable trade secrets, Elkin also engaged in an elaborate deception that duped one of Savills Studley's vendors into believing that Savills Studley's was not the true owner and accountholder of an online database containing confidential client and company information amassed over several years by Savills Studley's real estate brokers ("Savills-Apto Client Database" or "Database").  Elkin deliberately misrepresented to Savills Studley's third-party vendor hosting the database—Apto, Inc. ("Apto")—that *she* was the rightful owner of the client database.  Through this deception, and despite Elkin's resignation from Savills Studley, Elkin caused Apto to reassign administrative rights to Elkin.  Using this administrative access, Elkin then took steps to freeze and deactivate the user accounts of all other Savills Studley end users from the Denver office, and then took the further step of freezing and deactivating Apto's own administrative credentials to the Database.  This prevented Apto from not only accessing the Savills-Apto Database, but also from restoring Savills Studley's access in

a timely manner.  At the same time, Elkin changed the account credentials from her work email to her personal email account, so that she could continue to access the company's account after her employment ended—all in clear violation of her employment agreement and her fiduciary position at the company.

This is an ideal case for issuance of a preliminary injunction to enforce the terms of Elkin's contract and prevent her from illicitly utilizing Savills Studley's proprietary and trade secret information.  Without a court order requiring Elkin to return all of the information she stole—both hard copies and electronic data—Savills Studley will continue to suffer irreparable harm for which it has no adequate remedy at law.  As discussed in detail below, Savills Studley has a strong likelihood of success on the merits of its claims for breach of contract, breach of fiduciary duty, conversion, and violations of the Defend Trade Secrets Act and the Colorado Uniform Trade Secrets Act.  With every passing day that Elkin has access to Savills Studley's trade secrets, which it acquired and cultivated over several years through immeasurable time and effort, the value those secrets drastically decreases.  Moreover, the balance of equities clearly weigh in favor of Savills Studley, which is the aggrieved party attempting to enforce the clear and express terms of Elkin's employment agreement.  And the public interest favors enforcement of confidentiality provisions of employment contracts.  Savills Studleys has exhausted all of its options to resolve this dispute without court intervention.  Accordingly, the Court should grant Savills Studley's motion for a preliminary injunction and stop Elkin's pattern of deceit and treachery once and for all.

## STATEMENT OF FACTS

**I.     Defendant Ashley Elkin's Employment with Savills Studley.**

Savills Studley is a real estate services and brokerage firm specializing in commercial tenant-side representation and consulting.  (Verified Compl. ¶ 12.)  Savills Studley has thirty-one (31) offices located in North America, including an office in Denver, Colorado.  (*Id.* ¶ 13.) Savills Studley hired Elkin on September 24, 2012 as an Assistant Director in its Washington, D.C. office.  (*Id.* ¶ 14.)   On March 11, 2015, Elkin subsequently transferred from the Washington, D.C. office to the Savills Studley Denver office.  (*Id.*)  Elkin was responsible for originating commercial real estate brokerage business for Savills Studley and for servicing existing commercial real estate brokerage business.  (*Id.* ¶ 15.)

When she was hired, Elkin signed an employment agreement on September 12, 2012 (the "Employment Agreement"), and agreed to abide by all company policies and practices. (Verified Compl. ¶ 16 & Exhibit A thereto.)   Savills Studley and Elkin entered into the Employment Agreement to protect Savills Studley's trade secret, proprietary and confidential information and legitimate business interests, and to establish the terms and conditions of Elkin's employment with Savills Studley.  (*Id.* ¶ 17.)   The Employment Agreement, among other restrictions, contains confidentiality, work product, non-compete, and non-solicitation restrictions, and imposes specific obligations on employees who terminate their employment. (*Id.* ¶ 18.)

The confidentiality provision of the Employment Agreement provides, in pertinent part:

**5.  Confidentiality.**

The Company possesses and continuously develops or acquires information not known to the general public relating to its current, future or prospective business

clients or suppliers, and its and its current, future and prospective clients' and suppliers' plans, prospects, procedures, means and methods, trade secrets, business information, financial data or material (all such information not known to the general public, whether in tangible or intangible form, including information received from current, future and prospective clients and suppliers, being herein called the "**Company Information**"). The parties intend that the term Company Information (i) will be read as broadly as possible, irrespective of whether any particular item constitutes a "trade secret" under applicable law, to include information developed by you as well as others, and whether now existing or developed in the future, and *(ii) includes, without limitation, any Company client or supplier lists; information regarding pending or closed transactions; information developed by the Company pertaining to client preferences or plans; current, future, and prospective client names and requirements and all data provided by current, future, and prospective clients; financial, personal or business information; and business, marketing and research methods, strategies, plans and projections*, and (iii) excludes information which the Company publishes on its website, in newsletters, publicly released market reports and similar publications. *You acknowledge that the Company Information is a unique and valuable asset of, and acquired at great time and expense by, the Company or its current, future, or prospective clients or suppliers*, and that the Company takes adequate and reasonable steps to protect the confidentiality of the Company Information, and *you agree that you (i) will hold all Company Information in confidence, (ii) will not use or disclose any Company information . . . (iv) will at all times during or after your employment with the Company refrain from any acts or omissions that would reduce the value of Company Information*. You further agree that any disclosure or other use of the Company Information in violation of the foregoing would be wrongful and would cause irreparable harm to the Company. *Upon the termination of your employment by the Company (whether terminated by you or the Company) . . . you shall return to the Company all Company Information in tangible form (including all copies thereof)*. Upon and following the termination of your employment (whether terminated by you or the Company) *you shall not thereafter use or disclose any of the Company Iinformation for any purpose*, except as you may be required by subpoena or other requirement of law.

(Verified Compl. ¶ 19; Exhibit A, at Attachment B ¶ 5 (emphasis added).)

The Employment Agreement also contains a work product provision, which provides:

**6. Work Product.**

*Any and all programs, analysis, design, development, applications, process and related services whether prepared or performed by, or provided to, you while employed by the Company*, including without limitation all diagrams, charts and

other material related thereto (collectively, "**Work Product**") are, and *shall at all times be, the sole and exclusive property of the Company from and at such time as any thereof is created*.  The Company shall have the sole right to use the Work Product or refrain from using it, and may use and/or reproduce all or any portion of the Work Product as the Company chooses at any time and from time to time, in its sole discretion.  *You agree to assign and hereby do assign to the Company the sole and exclusive right, title and interest in all Work Product, and agree to execute and deliver to the Company and all documents that the Company may request, to convey to the Company any interest you may have in any Work Product, or that are otherwise necessary to protect and perfect the Company's interest in such Work Product*.

(Verified Compl. ¶ 20; Exhibit A, at Attachment B ¶ 6 (emphasis added).)

As it pertains to non-competition, the Employment Agreement states:

**7.  Non-Competition.**

You shall not, during the term of your employment by the Company and for a period of ten (10) months after termination of your employment with the Company . . . directly or indirectly, as an individual or as an employee, agent, officer, director, shareholder, partner or member of any other company or other organization ("**New Employer**"), solicit business from, or provide service to (excluding business or services wholly unrelated to those conducted or offered by the Company), or adversely affect or attempt to adversely affect the Company's dealings with, any individual, company or other organization (i) to which during the term of your employment by the Company you provided service (or assisted others in providing service) or (ii) from which during the term of your employment by the Company you solicited business (or assisted others in soliciting business), or (iii) with which during the term of your employment by the Company you had contact (but excluding any clients for whom you closed transactions in the year prior to commencing employment with the Company[)].

You agree that *the foregoing restrictions are necessary to protect: against (i) disclosure of Company Information including disclosure of confidential information regarding the Company's customers and clients*, and you acknowledge that any violation of this provision would result in the inevitable disclosure of, Company Information, (ii) damage to the Company's goodwill, and (iii) the irreparable harm that would result from any violation of this provision by you because of the unique nature of your services to the Company.

(Verified Compl. ¶ 21, Exhibit A, at Attachment B ¶ 7 (emphasis added).)

The Employment Agreement also contains an acknowledgments paragraph, which states, in pertinent part:

### 9.  Acknowledgments by Employee.

…You agree that the potential harm to the Company of the non-enforcement of your obligations under the Confidentiality, Work Product, Non-Competition, and Non-Solicitation provisions of this Agreement outweighs any harm to you due to their enforcement by injunction or otherwise.  *And you acknowledge that you have carefully read this Agreement and have given careful consideration to the restraints imposed upon you by this Agreement and are in full accord as to their necessity for the reasonable and proper protection of the Company, the Information, the Work Product and the Company's client and employee relationships*.

In the event of any breach by you of any of the provisions of Section 5, 6, 7 or 8 of this Agreement, *you acknowledge that the Company shall be entitled to obtain from any court of competent jurisdiction temporary, preliminary and permanent injunctive relief to restrain such breach*.  You agree that the Company shall not be required to post a bond in order to obtain injunctive relief, and you waive your right to a bond in the event a court enters a temporary or preliminary injunction.  You further acknowledge that the provisions of Sections 5, 6, 7 and 8 above are reasonable and necessary to protect the Company's legitimate protectable interests.  The Company's right to obtain an injunction or other equitable relief to enforce such terms of the Agreement shall be in addition to all other rights the Company may otherwise have.

(Verified Compl. ¶ 22; Exhibit A, at Attachment B ¶ 9 (emphasis added).)

The Employment Agreement also contains a paragraph that sets forth Elkin's obligations when she terminates her employment, which states, in pertinent part:

### 15.  Salesperson Terms and Conditions: Termination Obligations

. . .Upon any such termination of employment, the following shall apply: . . . (b) *immediately turn over to the Company all correspondence, files, memoranda and other records retained by Salesperson relating to Salesperson's business activities*, provided that Salesperson shall be entitled to retain and/or obtain from the Company promptly upon written request, copies of such materials as are reasonably necessary for Salesperson to close the transactions listed on the Termination Transaction List and agreed to by the Company, (c) cooperate with the Company in effecting a smooth transition of such business activities and in

ensuring that the termination does not disrupt any ongoing transactions . . . . *Salesperson agrees, in any event, not to disparage the Company or otherwise take any action that would disrupt the Company's ongoing business or client relationships*.

(Verified Compl. ¶ 23; Exhibit A, at Attachment C ¶ 15 (emphasis added).)

The Employment Agreement remained in full force and effect throughout Elkin's employment with Savills Studley; and the foregoing provisions expressly survive the term of Elkin's employment.  (Verified Compl. ¶ 24.)

## II.  Savills Studley Compiles and Cultivates Unique Client, Market, Research, and Company Information To Set Itself Apart From Its Competitors.

For years, all of the employees in Savills Studley's Denver office have collectively and regularly compiled and cultivated unique and competitively-sensitive client, market, research, and company information for use in conducting Savills Studley business.  This includes, for example, transaction data, contact names, phone numbers, email addresses, personal notes, histories of conversations, prompts on when to contact prospective and current clients, Savills Studley-curated brokerage presentations and plans, unique Savills Studley brokerage tools and resources available only to Savills Studley employees, Savills Studley proprietary market and client research and analysis, proprietary financial analyses of real estate holdings and positions, and research regarding prospective clients and prospective commercial opportunities for existing clients.   (Verified Compl. ¶ 25.)  By virtue of the unique Savills Studley business model, the employees in Savills Studley's Denver office have been able to acquire and aggregate data that its competitors would not otherwise be able to obtain, and use it in a manner that affords more value to Savills Studley's existing and prospective tenant clients.  (*Id.* ¶ 26.)  Because of the significant time, effort, expense and expertise devoted by the Savills Studley Denver office to

aggregating, organizing, and cultivating this uniquely valuable client, market, research, and company information, Savills Studley has consistently treated this information as "Company Information" and "Work Product," as those terms are broadly defined in Elkin's Employment Agreement  (*Id.* ¶ 27.)

It is this Company Information and Work Product that provides Savills Studley with the competitive edge over other brokerage firms in and around the Denver area.  (Verified Compl. ¶ 28.)  Indeed, Savills Studley is the leading commercial real estate services firm in the U.S. specializing in tenant representation.  (*Id.*)  This business model, and the company information and work product generated and aggregated by the Savills Studley Denver office permits Savills Studley to advocate for its tenant-only clients in a unique way.  (*Id.*)  Furthermore, it is this Company Information and Work Product that has enabled Savills Studley's Denver office to more than double in size (and revenues) since 2017.  (*Id.* ¶ 29.)

Given the highly proprietary, competitive, sensitive, and confidential nature of this company information and work product, Savills Studley had strict policies and procedures in place regarding the compilation, access, and disclosure of this company information and work product—as made clear, for example, in the comprehensive Employment Agreement Elkin signed.  (Verified Compl. ¶ 30.)  What is more, and pursuant to these policies, company information and work product was to be stored on Savills Studley-managed corporate and company networks only.  (*Id.*)  And access to the Savills Studley network required two-factor authentication and Savills Studley-issued credentials. (*Id.*)

III.   **Savills Studley Contracts with Apto to Create a Customized Data of Company and Client Information for the Denver Office.**

In an effort to consolidate, organize, and more thoughtfully aggregate certain office-specific company information and work product, Savills Studley's Denver office decided to utilize a customized third-party platform created and managed by Apto, Inc. ("Apto"). (Verified Compl. ¶ 31.)  To that end, Savills Studley's Denver office entered into a Subscription Services Agreement with Apto to begin using Apto's CRM platform, and started building the Savills-Apto Client Database thereon.  (*Id.* ¶ 32.)  Savills Studley's Denver brokers use Apto to manage and aggregate its confidential client and prospective client data and work product, track and manage communications with clients and prospective clients, track and manage client leads, and track and manage Company Information, plans and research regarding existing clients, plans and research regarding prospective clients and prospective business opportunities for existing clients, mark up and analyze client files, aggregate and organize market research and pricing analyses. (*Id.* ¶ 33.)  This company information and work product that was aggregated and organized in the Savills-Apto Client Database included, importantly, information and data that only Savills Studley was in a unique position to receive.  (*Id.* ¶ 34.)

Additionally, Savills Studley's Denver brokers collect client data by foot, canvassing buildings, and also via phone calls to decision makers at prospective and current clients. (Verified Compl. ¶ 35.)  The brokers gather information related to prospective and current clients' real estate, as well as their real estate-related business plans.  (*Id.*)  The brokers also analyze and aggregate information from public databases and records, private databases to which Savills Studley subscribes, press releases, building sale offerings, comparables, word of mouth, building owner press releases, market reports, and loan databases.  (*Id.*)

Savills Studley's Denver brokers compile all this information into the database stored on Apto's platform—the "Savills-Apto Client Database." (Verified Compl. ¶ 36.) The Database is shared and created collectively by the Denver office, and every Savills Studley Denver employee who gathers data enters it into the shared Savills-Apto Client Database, which is accessed and utilized only by licensed end users authorized by Savills Studley. (*Id.*) Savills Studley's Denver brokers use information from the Client Database to compile market and tenant statistics in order to prioritize day-to-day tasks, prioritize client and prospective client interaction, populate analysis and research initiatives, and service the Company's national clients that may have needs in the metropolitan area of Denver, Colorado. (*Id.* ¶ 37.)

During and in furtherance of her employment at Savills Studley, Elkin was the account administrator for the Savills-Apto Client Database on behalf of the Savills Studley Denver office. (Verified Compl. ¶ 38.) And during and in furtherance of her employment at Savills Studley, Elkin signed, on behalf of Savills Studley and in her capacity as Assistant Director, the order forms for the end-user licenses procedure from Apto for the use of the Savills-Apto Client Database by employees of the Savills Studley Denver office. (*Id.*) And only authorized end-users, with specially administered, unique Apto credentials, may access the Savills-Apto Client Database. (*Id.* ¶ 39.)

## IV.     Elkin's Trespass, Theft, and Misappropriation of Savills Studley's Confidential, Proprietary, and Trade Secret Information.

Inexplicably, on the night of September 20, 2018, going well into the early hours of the morning of September 21, 2018, Elkin and an unknown male companion entered the Savills Studley's Denver office premises. (Verified Compl. ¶ 40.) Surveillance footage shows Elkin and the unknown male companion going in and out of the Denver office and removing a large

number of boxes from the premises.  (*Id.* ¶ 41.)  When employees arrived to the office on the morning of September 21, 2018, they arrived to find Elkin had entirely cleared out her desk, removing every file and item from her cubical and locker, and leaving only her desktop computer.  (*Id.* ¶ 42.)  Then, on September 21, 2018 at 3:39 p.m. MDT, just hours after she absconded with boxes of documents from the Denver office, Elkin abruptly resigned her employment from Savills Studley via a one-sentence email sent to Mr. Schuham, stating only, "I am resigning and leaving."  (*Id.* ¶ 43 & Exhibit B thereto.)

Following Elkin's abrupt resignation, Rick Schuham, Vice Chairman and Director of Savills Studley's Denver office, and Sheila Stone-Sheehy, Operations Manager of the Savills Studley Denver office, took steps to deactivate Elkin's company credentials to both company networks and property.  (Verified Compl. ¶ 44.)  It was during that process that Savills Studley discovered Elkin's late night visit to the Denver office the night before her resignation and her theft of company information and property.  (*Id.*)  As a result of this discovery, Savills Studley conducted a forensic analysis of Elkin's computer and electronic resources to evaluate whether Elkin had stolen any other company information or work product.  (*Id.*)  From that forensic investigation, Savills Studley's IT team discovered Elkin had uploaded approximately 100 GB of company files and information from her company-issued computer and company-maintained servers to her personal Dropbox account outside the company from August 23-26, 2018 and again on September 21, 2018.  (*Id.* ¶ 45.)  This amounted to tens of thousands of company files.  (*Id.*)

Indeed, the company information and work product Elkin systematically took from the company comprised some of the company's most valuable and competitively sensitive market

analyses, aggregated client data, and prospective client leads and business opportunities for the Denver office. (Verified Compl. ¶ 46.) Critically, the company information and work product also included the data and information described above to which Savills Studley had unique access given its unique business model as a tenant-only brokerage business. (*Id.*) All of this company information and work product constitutes data and information which sets Savills Studley apart from and gives it a competitive advantage over its competitors. (*Id.*) In addition to the electronic files of company information and work product Elkin stole from the company's networks, Savills Studley's IT team also found that in the weeks leading up to her resignation Elkin also took steps to delete files and folders she generated during her employment with Savills Studley. (*Id.* ¶ 47.)

## V.  Elkin Blocks Savills Studley's and Apto's Access to Savills Studley's Client Database.

On September 21, 2018, in light of Elkin's abrupt resignation, Ms. Stone-Sheehy and Mr. Schuham had a call with Chadd Smith, Customer Success Manager at Apto, asking that Apto change the administrator for the Savills-Apto Client Database from Elkin to MacKenzie Garrabrant, a current employee of Savills Studley's Denver office. (Verified Compl. ¶ 48.) The Database activity logs reveal that following that call, on September 21, 2018, Apto took steps to reassign Elkin's credentials to Ms. Garrabrant, change the default lead user to Ms. Garrabrant, and deactivate Elkin's account. (*Id.* ¶ 49.) On the same day, however, just two hours later, the Database activity logs show that Apto then reactivated Elkin's administrative credentials and changed the lead default user back to Elkin, and deactivated Ms. Garrabrant's credentials. (*Id.* ¶ 50.) As Savills Studley understands, based upon information and belief, on September 21, 2018, when Elkin discovered her Apto credentials had been deactivated, she contacted Apto and

intentionally misrepresented to Apto that she was the rightful owner of the Savills-Apto Client Database.  (*Id.* ¶ 51.)  Based on that false representation and the fact that Elkin had previously been the account administrator for the Database, Apto reactivated Elkin's administrative credentials and changed the lead default user back to Elkin.  (*Id.*)

Just minutes after Elkin's access was restored, the Database activity logs show that on September 21, 2018, Elkin proactively froze and deactivated the credentials for all of Savills Studley's authorized users, and changed the email associated with her Apto credentials from her work email address (aelkin@savills-studley.com) to her personal email (Gmail) account, presumably to permit her to access the account after her resignation from Savills Studley. (Verified Compl. ¶ 52.)  Then, on September 25, 2018, four days after her resignation, while still illicitly holding her administrative credentials hostage, the Database activity logs show that Elkin froze and deactivated Apto's <u>own</u> administrative account for the Savills-Apto Client Database. (*Id.* ¶ 53.)  As a result of that action, Apto was powerless to access and control the Database and was precluded from restoring Savills Studley's access to its Database.  (*Id.*)  Upon information and belief, Elkin's actions forced Apto to request from Salesforce, the ultimate operator of the platform, to shut down the Savills-Apto Client Database entirely so that no party—not Elkin, not Savills Studley, and not even Apto—could access or control the Database.  (*Id.* ¶ 54.)

On October 2, 2018, Savills Studley sent a letter to Elkin, requesting that she provide a detailed description of what she removed from the Denver office the night of September 20 and the morning of September 21, and instructed her to refrain from deleting, destroying, altering, or giving or disclosing company documents, information or property to any third party, and to

return all Company documents, information and property to Savills Studley.  (Verified Compl. ¶ 55 & Exhibit C thereto.)  Elkin did not respond to Savills Studley's letter.  (Id. ¶ 56.)

Ten days later, on October 12, 2018, Savills Studley sent Elkin a second cease-and-desist letter, requesting that (i) she notify Apto in writing that she is not the rightful owner or accountholder of the Savills-Apto Client Database, and that she relinquish any previously claimed rights to access the Database, (ii) she return all copies of information she uploaded or otherwise obtained from the Database, (iii) provide a full accounting of the company documents and files—both electronically and in hard copy—she removed from the company premises in the days leading up to her resignation, (iv) return all copies—whether electronically held or held in hard copy—of all company information and work product removed from the company premises and networks without authorization, and (v) identify the male companion that came to the Denver premises on the night of September 20, 2018 and early morning September 21, 2018 who helped Elkin remove boxes.  (Verified Compl. ¶ 57 & Exhibit D thereto.)  After much delay, Savills Studley was contacted by Elkin's attorney.  (Id. ¶ 58.)  Though the parties' counsel had a couple of telephone conversations, no resolution has been reached, no accounting was provided, no company information or work product returned, and no representation made to Apto clarifying that Savills Studley was the rightful owner of the Savills-Apto Client Database.  (Id.)

Because Elkin had locked Apto out of its own technology by freezing and deactivating Apto's administrative access, and frozen Savills Studley frozen out of the Savills-Apto Client Database, it took Savills Studley tens of thousands of dollars in out-of-pocket expenses, significant internal resources, and over one month to regain access.  (Verified Compl. ¶ 59.)  As a result, for an entire month, Savills Studley's brokers were unable to access the Client Database,

and were prevented from performing their day-to-day work, causing significant disruption to Savills Studley's operations.  (*Id.* ¶ 60.)  Savills Studley's Denver brokers were unable to access current and prospective client information. (*Id.* ¶ 61.) They did not have access to the details of conversations or the history of information shared with current and prospective clients, or interactions others have had with specific individuals to inform future discussions, and therefore did not have a meaningful way to communicate with their current and prospective clients and contacts.  (*Id.*)

Elkin's willful and deliberate blocking of Savills Studley's access to the Database also prevented Savills Studley's Denver brokers from thoughtfully sorting prospects, which is a critical exercise in organizing their prospecting activities.  (*Id.* ¶ 62.)  These details help employees develop to have productive conversations with current and prospective clients.  (*Id.*) Savills Studley's Denver brokers also lost access to their automated reminders and prompts, which inform them of dates to call current and prospective clients for follow-up purposes, in order to develop and maintain client goodwill and relations.  (*Id.* ¶ 63.)  Without access to the Savills-Apto Client Database, Savills Studley's Denver brokers also could not sort their aggregated data by industry group to help clients understand their position in real estate as it relates to industry peers.  (*Id.* ¶ 64.)  They could not access or sort data by building or landlord, preventing brokers from identifying prospective clients in a building Savills Studley has recently done work on, or who rent from common landlords.  (*Id.*)

Simply, Elkin's sabotage prevented Savills Studley's Denver office from operating effectively for an entire month.  (Verified Compl. ¶ 65.)  All the while, Elkin had in her possession competitively sensitive confidential, proprietary, and trade secret information that she

had stolen from Savills Studley and that she had previously threatened to sell and use competitively against Savills Studley. (*Id.*) After significant time, expense, negotiation, third-party involvement, and daily calls and conversations with Apto and outside counsel, Savills Studley finally regained access to the Savills-Apto Client Database on October 26, 2018. (*Id.* ¶ 66.)

## ARGUMENT

### I.   THE GOVERNING STANDARD WARRANTS ISSUANCE OF A PRELIMINARY INJUNCTION.

To be entitled to a preliminary injunction, the Plaintiff must show: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *See, e.g.*, *Planned Parenthood of Kansas v. Anderson*, 882 F.3d 1205, 1223 (10th Cir. 2018) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). It is well-established that "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). For this reason, "[t]he fact that evidence might be excludable goes to the weight of that evidence, not necessarily its admissibility." *DigitalGlobe, Inc. v. Paladino*, 269 F. Supp. 3d 1112, 1119 (D. Colo. 2017). To obtain a preliminary injunction, "the movant's right to relief must be clear and unequivocal" and Plaintiff clearly satisfies this standard here. *See Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016).

### II.   SAVILLS STUDLEY HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS AGAINST ELKIN.

Savills Studley's Verified Complaint demonstrates a strong *prima facie* showing that Elkin has breached and will continue to breach her Employment Agreement by removing

Savills' Studley's confidential, proprietary, and trade secret information from Savills Studley's premises and uploading such information on the eve of her resignation.  These same actions also constitute a breach of Elkin's fiduciary duty to her former employer.  Elkin also breached her fiduciary duty when she wrongfully misrepresented to Apto that *she*, not Savills Studley, was the rightful owner and accountholder, causing Apto to block Savills Studley's access to its account, which prevented Savills Studley from conducting its normal course of business.  Elkin's theft of these these materials also constitutes conversion of Savills Studley's property.  These materials further constitute trade secrets and therefore Elkin's misappropriation constitutes a violation of the Defend Trade Secrets Act and the Colorado Uniform Trade Secrets Act.  Without immediate injunctive relief requiring Elkin to account for and return all of the materials she uploaded, exported, and/or removed from Savills Studley's premises, Company networks, and the Savills-Apto Client Database, Elkin will continue to violate her contractual and fiduciary duties, and will continue to retain unauthorized possession of Savills Studley's property.

> **A. Savills Studley Is Likely to Prevail on the Merits of Its Breach of Contract Claim.**

Elkin blatantly breached the Confidentiality and Work Product provisions of her Employment Agreement when she improperly uploaded Savills Studley's confidential, proprietary, and trade secret information and removed Savills Studley's property from the Denver office on the eve of her resignation.  To prove a breach of contract, a plaintiff must demonstrate: (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of contract by the defendant, and (iv) resultant injury to the plaintiff.  *See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992); *TBL Collectibles, Inc. v. Owners*

*Ins. Co.*, 285 F. Supp. 3d 1170, 1197 (D. Colo. 2018).  Savills Studley satisfies all four of these elements.

Colorado courts routinely grant preliminary injunctions in breach of contract cases analogous to this case.  For instance, in *Executive Consulting Group, LLC v. Baggot*, the court granted plaintiff company's motion for a preliminary injunction against a former employee who breached her employment agreement and misappropriated trade secrets.  No. 1:18-cv-00231, 2018 WL 1942762 (D. Colo. Apr. 25, 2018).  The former employee had access to the company's secured, password-protected systems, including the company's customer relationship management software.  *Id.* at *2.  In the days leading up to her resignation, the employee emailed herself lists of clients and client contacts, project lists, confidential client presentation materials, pitch decks, among other confidential information.  *Id.* at *3.  The court held the company had a substantial likelihood of success on the merits of both its breach of contract and trade secret misappropriation claims.  *Id.* at *6-8.  As for the breach of contract claim, the facts showed the employee breached the confidentiality provision by emailing herself information covered by the definition of confidential information in her employment agreement, which included client lists, client contact information, the company's internal memoranda and documents, and client proposals.  *Id.* at *6.

Similarly, here Savills Studley has a strong likelihood of success in proving Elkin breached her Employment Agreement.  The Employment Agreement with Savills is a valid and enforceable contract, dated and signed by both parties.  The parties acted pursuant to the Employment Agreement for approximately six years, and it is undisputed that Savills Studley fully performed under the contract.  The Employment Agreement's Confidentiality and Work

Product provisions require Elkin to hold all Company Information in confidence and refrain from any acts that reduce the value of that information. (Employment Agreement, at Attachment B ¶¶ 5-6.) It further requires that, upon Elkin's termination of employment, she return to Savills Studley all Company Information, including all copies. (*Id.*) Elkin also agreed that all programs, analysis, design, development, applications, process and related services prepared or performed by her while employed constitute "Work Product" which belong solely to Savills Studley. (*Id.*) By her actions, Elkin has clearly violated the Confidentiality provisions of her Employment Agreement, which entitles Savills Studley to injunctive relief pursuant to the express terms of the Employment Agreement. (*See* Employment Agreement, at Attachment B ¶ 9 ("In the event of any breach by you of any of the provisions of Section 5, 6, 7 or 8 of this Agreement, *you acknowledge that the Company shall be entitled to obtain from any court of competent jurisdiction temporary, preliminary and permanent injunctive relief to restrain such breach*." (emphasis added).)

As in *Baggot*, Elkin breached the Confidentiality and Work Product provisions of the Employment Agreement by removing boxes of Savills Studley's property the night before she resigned, and by uploading Savills Studley's data to her personal Dropbox in the weeks leading up to her resignation. Contrary to Elkin's obligations under the Employment Agreement, and despite Savills Studley's multiple requests, Elkin has not returned Savills' Company Information and Work Product. Her actions diminish the value of Savills Studley's confidential, proprietary, and trade secret information, which derive their value from its secrecy and the economic advantage they give to Savills Studley.

**B. Savills Studley Is Likely to Succeed on the Merits of Its Breach of Fiduciary Duty Claim.**

For similar reasons, Savills Studley is also likely to succeed on its breach of fiduciary claim against Elkin.  Colorado law recognizes that employees owe fiduciary duties, including the duty of loyalty, to their employers.  *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 493 (Colo. 1989); *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1023 (Colo. App. 1993); *Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1114 (D. Colo. 2016).  If the employee has agency to act on the employer's behalf, a fiduciary relationship exists.  *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1023 (Colo. App. 1993).  In such a case, the fiduciary duty of loyalty requires that an individual acts solely for the benefit of the principal.  *Wells Fargo*, 276 F. Supp. 3d at 1114.  Moreover, "[r]esignation or termination does not automatically free a director or employee from his or her fiduciary obligations."  *T.A. Pelsue Co. v. Grand Enters., Inc.*, 782 F. Supp. 1476, 1486 (D. Colo. 1991).

To recover under a breach of fiduciary duty cause of action a plaintiff must show: (i) the defendant was acting as a fiduciary of the plaintiff; (ii) the defendant breached their fiduciary duty; and (iii) that the defendant's breach caused the plaintiff's damages.  *Taylor v. Taylor*, 381 P.3d 428, 431 (Colo. App. 2016).  Savills Studley is likely to succeed on each of these elements.

During her employment with Savills, Elkin held the position of Assistant Director and had the authority to act on Savills Studley's behalf.  Indeed, she was the Apto account administrator on behalf of Savills Studley, and acted as the liaison between Savills Studley and Apto.  Elkin breached her fiduciary duty by uploading Savills Studley's confidential, proprietary, and trade secret information to her Dropbox, and by stealing boxes of Savills Studley's property

in the dead of night on September 20 and 21, 2018. *See Reconstruction Experts Inc. v. Franks*, No. 2018CV30508, 2018 WL 1973177, at \*5-6 (D. Colo. Feb. 23, 2018) (granting preliminary injunction, finding plaintiff had a likelihood of success on the merits of its breach of fiduciary duty claim where the former employee, while still employed, solicited a co-worker to work for a competing company). She further breached her fiduciary duty by misrepresenting to Apto that she, not Savills Studley, was the true owner of the Apto account and Client Database, causing Apto to block Savills Studley's access to the account. These representations were false, and Elkin knew they were false. As a result, Elkin willfully interfered with Savills Studley's ability to conduct a substantial amount of business in the weeks following her resignation. Contrary to her obligation to act solely in Savills Studley's benefit, Elkin conduct evinces her intent to injure Savills Studley.

**C.  Savills Studley Is Likely to Succeed on the Merits of Its Conversion Claim.**

Elkin's unauthorized uploading of Company Information and Work Product to her personal Dropbox, and her unlawful taking of Savills Studley's Company Information and property from its premises also evidences Savills Studley's likelihood of success on its conversion claim. Under Colorado law, conversion is "any distinct, unauthorized act of dominion or ownership exercised by one person over the personal property belonging to another." *Itin v. Ungar*, 17 P.3d 129, 136 (Colo. 2000); *Rhino Fund, LLP v. Hutchins*, 215 P.3d 1186, 1195 (Colo. App. 2008). To demonstrate conversion a plaintiff must show (i) the defendant has committed a distinct act of ownership or control over property; (ii) the property belonged to the plaintiff; (iii) the act was unauthorized; (iv) the plaintiff demanded return of the property; and (v) the defendant refused to return the property. *Scott v. Scott*, 2018 WL 1007957,

at *6 (Colo. App. 2018) (citing *Glenn Arms Assocs. v. Century Mortg. & Inv. Corp.*, 680 P.2d 1315, 1317 (Colo. App. 1984)).

Elkin's actions here are similar to those of the defendant employees in *Statera, Inc. v. Henrickson*, No. 09-cv-01684, 2009 WL 2169235 (D. Colo. July 17, 2009). In *Henrickson*, the court granted a temporary restraining order on an employer's claims, including conversion, against two former employees. *Id.* The defendants had downloaded, copied, and emailed to themselves the company's confidential and proprietary information just days before they resigned. *Id.* at *2. Here, on the night before she resigned, Elkin entered Savills' offices under cover of darkness and removed documents and other Savills Studley property from the premises. And, between August and September, she uploaded approximately 100 GB of Savills Studley's confidential, proprietary, and trade secret information to her Dropbox. In doing so, she committed an act of unauthorized control over Savills Studley's property. Savills Studley twice demanded Elkin return what she took in letters dated October 2, 2018 and October 12, 2018. She ignored these demands, and continues to wrongfully remain in possession of Savills Studley's property and data.

In light of Savills Studley's strong likelihood of success on the merits of its conversion claim, coupled with Elkin's willful refusal to return the confidential, proprietary and trade secret information she took from Savills Studley, preliminary injunctive relief is warranted to effectuate the return of Savills Studley's Company Information. Therefore, the Court should issue a preliminary injunction requiring Elkin to return all of the Company Information and property she stole, misappropriated, and/or uploaded without authorization.

**D.  Savills Studley Is Likely to Succeed on the Merits of Its Defend Trade Secrets Act Claim.**

Elkin's unauthorized uploading of the Dropbox materials and taking of Savills Studley's hard copy documents demonstrates Savills Studley's likelihood of success on its Defend Trade Secrets Act ("DTSA") claim.   Under the DTSA, a person misappropriates trade secrets when: (i) there is an existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (ii) the person acquires, uses, or discloses the trade secret without consent; and (iii) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means.  18 U.S.C. §1839(5).  The statute broadly defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means…."  18 U.S.C. §1839(3).

Elkin's actions here are similar to those of the defendant in *Loenbro Inspection, LLC v. Sommerfield*, No. 18-cv-01943-PAB, 2018 WL 3659396 (D. Colo. Aug. 2, 2018).  In *Loenbro Inspection* the court granted a TRO on an employer's claim, including under the DTSA,  against three former employees. *Id.*  The employees had retained data from a memory card containing proprietary company information and trade secrets following their departure from the company. *Id.*  Here, the materials Elkin retained through her Dropbox account, and the hard copy documents she removed from the Savills Studley premises, include (among other documents) client lists, corporate intelligence, and deal documentation.  These documents provide Savills Studley with value by creating a competitive advantage for the company.  Savills Studley has

taken significant efforts in confidentiality and has taken care to keep them confidential. These efforts include maintaining them in secure databases – such as the Apto system – and limiting access only to those employees who need access.

The above demonstrates that Savills Studley's materials at issue constitute protectable trade secrets under the DTSA. Elkin uploaded these trade secrets to her private Dropbox account without authorization and unlawfully retained them after her employment terminated. As Elkin was the one who removed the hard copy documents from Savills Studley's premises, she knew that they were acquired through improper means. Furthermore, her secretive and unauthorized syncing of her personal Dropbox account to a Savills Studley owned computer in order to upload Savills Studley's files, and her subsequent deletion of the files from her company desktop computer, demonstrate her knowledge that these actions were also improper.

In light of Savills Studley's strong likelihood of success on the merits of its Defend Trade Secrets Act claim, coupled with Elkin's willful refusal to return the confidential, proprietary and trade secret information she took from Savills Studley, preliminary injunctive relief is warranted to effectuate the return of Savills Studley's Company Information, including any and all Savills Studley trade secrets Elkin has misappropriated. Therefore, the Court should issue a preliminary injunction requiring Elkin to return all of the Company Information and property she stole, misappropriated, and/or uploaded without authorization.

### E. Savills Studley is Likely to Succeed on the Merits of Its Colorado Uniform Trade Secret Act Claim.

As with the DTSA, Elkin's actions in uploading documents to her personal Dropbox account, and removing hard copy materials, evidences Savills Studley's likelihood of success on its Colorado Uniform Trade Secret Act ("CUTSA") claim. CUTSA prohibits misappropriation

of trade secrets and defines misappropriation as "acquisition of trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Colo. Rev. Stat. §7-74-102(2).  The statute defines "trade secret" as "the whole or any portion or phase of … confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value" so long as the owner has "taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."  *Id.* §7-74-102(4).  The statute further defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  *Id.* §7-74-102(1).

In deciding whether something is a trade secret, Colorado courts look to the extent to the information is known outside of the business, the extent it is known inside the business, the precautions taken to guard the secrecy, the savings and value to the plaintiff in having the information as against its competitors, the amount of effort or money expended in obtaining the information, and the amount of time and expense it would take for others to acquire and duplicate the information.  *Saturn Sys., Inc. v. Militare*, 252 P. 3d 516, 521-22 (Colo. Ct. App. 2011).  Detailed customer information, client lists, customer contracts, pricing information, detailed debtor information, and customer log-in codes are considered to be trade secrets.  *Id.* at 527.

The materials in question are similar to those identified as fitting the definition of a trade secret in *Saturn Systems*, and Elkin acquired them through improper actions.  Among the documents are client lists, pricing and leasing information, customer proposals, and customer

information.    As discussed above, the industry that Savills Studley operates in relies on information, and companies compete for business using their accumulated knowledge and intel. Savills Studley obtained, compiled and created these materials at great expense, and these materials create a significant competitive advantage for the company.   The secrecy of this information is important to Savills Studley and the company takes efforts to maintain its confidentiality by maintaining it in secure offices and databases to which a limited number of people have access, and through contractual agreements with its employees that limit their sharing and use of the information.

Elkin has acquired these materials through improper actions that exceeded her authority and are outside of the scope of her employment with Savills Studley.   Elkin did not have authority to upload Savills Studley documents to a personal Dropbox and did not have authorization to remove the hard copy documents from Savills Studley's premises.   As discussed above, taking these actions was a breach of Elkin's contractual and fiduciary duties to maintain confidentiality.

In light of Savills Studley's strong likelihood of success on the merits of its Colorado Uniform Trade Secrets Act claim, coupled with Elkin's willful refusal to return the confidential, proprietary and trade secret information she took from Savills Studley, preliminary injunctive relief is warranted to effectuate the return of Savills Studley's Company Information, including any and all Savills Studley trade secrets Elkin has misappropriated.   Therefore, the Court should issue a preliminary injunction requiring Elkin to return all of the Company Information, Work Product, and/or property she stole, misappropriated, and/or uploaded or exported without authorization.

**III.    SAVILLS STUDLEY WILL SUFFER IMMEDIATE AND IRREPARABLE INJURY WHICH MAY BE PREVENTED BY ISSUANCE OF A PRELIMINARY INJUNCTION, AND WHICH CANNOT BE ADEQUATELY REMEDIED AT LAW.**

Savills Studley has suffered, and will continue to suffer, immediate and irreparable injury if the Court does not require Elkin to return the confidential, proprietary, and trade secret information and property she stole.  Savills Studley has expended significant resources in obtaining and creating this information, which gives it a competitive advantage which, if lost, will be impossible to regain.  Furthermore, Elkin has already agreed and conceded that Savills is suffering irreparable harm as a result of her actions.  In the Employment Agreement, Elkin expressly "agree[d] that any disclosure or other use of the Company Information in violation of the foregoing would be wrongful and would cause irreparable harm to the Company." (Employment Agreement ¶ 5.)  Elkin has now taken such wrongful actions and created such irreparable harm.  *See Franks*, 2018 WL 1973177, at *7 (finding plaintiff employer faced real, immediate, and irreparable injury if the employee was not enjoined, where he agreed in his employment agreement that breach would irreparably harm the plaintiff).

Further, there is no plain, speedy, or adequate remedy at law for Savills Studley.  "Absent a temporary restraining order and preliminary injunction, [Savills Studley] will have to wait for the case to be fully litigated before receiving the relief that it deserves.  Waiting for a trial could take months, if not years." *Id.*  Waiting years for money damages will not protect Savills Studley from Elkin's use of Savills Studley's confidential, proprietary, and trade secret information.  Therefore, in the absence of injunctive relief, the irreparable harm will continue.

## IV.   THE PUBLIC INTEREST FAVORS ISSUANCE OF A PRELIMINARY INJUNCTION.

Injunctive relief would not adversely affect the public interest. To the contrary, injunctive relief would return wrongfully obtained property to its rightful owner and enforce a properly valid and enforceable contract. "It is … important for Coloradans to have confidence in their contracts and know that they will be enforceable. It is also important for Coloradans o know that former employees will not be allowed to steal trade secrets with impunity." *Franks*, 2018 WL 1973177, at *7. As lawful possession of property and enforcement of contractual rights are two of the fundamental elements of the legal system, enforcing them through injunctive relief would promote the public interest and faith in the judicial branch. *See also Henrickson*, 2009 WL 2169235, at *4 ("Prohibiting [defendants] from using, copying, distributing, or destroying information they obtained unlawfully from [plaintiff] would, if anything, tend to serve the public interest.").

## V.   THE BALANCE OF EQUITIES FAVORS A PRELIMINARY INJUNCTION.

Elkin's actions have created tremendous damage to Savills Studley from both a monetary and intangible standpoint all the while providing Elkin with the benefit of having Savills Studley's valuable Company Information and Work Product in her possession. An injunction ordering Elkin to return of the materials to Savills is the only avenue to begin to remedy this inequity. Once again, Elkin has agreed and conceded that this is the case. The Employment Agreement clearly states that Elkin "agree[s] that the potential harm to the Company of the non-enforcement of your obligations under the Confidentiality [and] Work Product…provisions of this Agreement outweighs any harm to you due to their enforcement by injunction or otherwise." (Employment Agreement ¶ 9.) Elkin "will suffer no harm that is recognized in law

if [she] is prohibited from using information to which [she] has no legal right.  On the other hand, the harm suffered by [Savills Studley] from the theft and unlawful use of this information is substantial."  *Henrickson*, 2009 WL 2169235, at *4.  The balance of equities weigh heavily in favor of injunctive relief.

**VI.   A PRELIMINARY INJUNCTION WILL PRESERVE THE STATUS QUO PENDING A TRIAL ON THE MERITS.**

Injunctive relief in this case will preserve the status quo.  "For purposes of an injunction, the status quo is the last uncontested status between the parties which preceded the controversy."  *Franks*, 2018 WL 1973177, at *8 (citation and quotation marks omitted).  Here, as in *Franks*, before the present controversy, Savills Studley "did not have to worry about" Elkin using or disclosing Savills Studley's confidential, proprietary, and trade secret information in violation of Elkin's contractual and fiduciary obligations.  Without an injunction, Elkin will disrupt the status quo by diminishing the value of Savills Studley's confidential, proprietary, and trade secret information, and taking away Savills Studley's competitive advantage.  A preliminary injunction is therefore necessary to prevent this disruption.

## CONCLUSION

For the foregoing reasons, Plaintiff Savills Studley, Inc. respectfully requests this Honorable Court enter an Order: (i) Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Elkin, requiring Elkin to return all of the Company Information, Work Product, and/or property she stole, misappropriated, and/or uploaded or exported without authorization; (ii) awarding Savills Studley its attorneys' fees and costs incurred in bringing this motion; and (iii) awarding any other relief this Court deems equitable and just.

Dated: November 8, 2018      Respectfully submitted,

*/s/ Christine A. Samsel*

Christine A. Samsel, No. 42114

BROWNSTEIN HYATT FARBER SCHRECK LLP

410 Seventeenth Street, Suite 2200

Denver, Colorado 80202

Telephone: 303.223.1100

Fax: 303.223.1111

Email:  csamsel@bhfs.com

Kari M. Rollins

David M. Poell

SHEPPARD MULLIN RICHTER & HAMPTON LLP

30 Rockefeller Plaza

New York, New York 10112

Telephone: 212.653.8700

Fax: 212.653.8701

Email: krollins@sheppardmullin.com

        DPoell@sheppardmullin.com

*Attorneys for Plaintiff Savills Studley, Inc.*